Plaintiff alleges that while performing the duties of his employment with defendant, the Chicago Rock Island Pacific Railroad Company, he sustained an injury to his right leg which produced total disability and which degree of disability, it is alleged, would continue until eight or nine months subsequent to the date of filing suit (October 30, 1939), and thereafter it would be partial. He sues for damages under the Federal Employers' Liability Act, 45 U.S.C.A. Sec. 51. To bring his case within the purview of this act, plaintiff alleged that interstate commerce passed over defendant's track in Jackson Parish, Louisiana, whereon he was working when injured. In the alternative, he prays for judgment for workmen's compensation under the Employers' Liability Act of Louisiana, Act No. 20 of 1914.
For a cause of action, plaintiff alleged that when injured he was assisting in the repairing of defendant's railroad track; specifically, that by the use of a heavy hammer he was driving a cross tie under the rails; that the tie appeared to be solid but was in fact defective in that its edge was rotten, a condition unknown to him; that he drew back the hammer for the purpose of striking a blow to the tie and some vines or bushes on the right-of-way caught the hammer; that he jerked it loose and struck the tie near one edge; that the blow caused the rotten or defective portion of the tie to give way, which, in turn, caused the hammer to deflect to one side, striking his right leg with such terrific force that both bones were broken and crushed and the muscles, ligaments, etc., thereof torn; that the accident would not have happened had the tie been sound. Various acts of negligence are charged to defendant and its agents as the cause of the accident and injury.
Defendant denies each and every allegation of the petition except it admits that interstate commerce passes over its track in Jackson Parish. No special pleas nor defenses were interposed. Plaintiff's demands were rejected and he appealed to this court.
Defendant's position is that plaintiff's disability is not ascribable to an injury or accident suffered while performing work for it; and, alternatively, that if he did experience the accident and consequent injury *Page 515 
and disability alleged upon, such were not the result of any negligence of its agents or employees.
The Federal Employers' Liability Act provides that "every common carrier by railroad while engaging in commerce between any of the several States * * * shall be liable in damages to any person suffering injury while he is employed by such carrier * * * for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier", etc. Sec. 51 of 45 U.S.C.A.
The admission of the parties brings the case within the purview of the aforementioned Federal statute. The State Employers' Liability Act is not applicable.
Plaintiff alleges that he was injured on June 14, 1939. The work crew, besides himself, consisted of Fred Mitchell, Charlie Mitchell and Lewis Lard. Guy Biggs was the foreman. They were engaged in spacing and tamping ties. The track was being raised and leveled. Gravel was being cut under the ties. To accomplish correct spacing it was necessary at times to strike the ties with a heavy hammer unless other means were employed to do so. When so engaged, plaintiff alleged and testified, he was injured. Notwithstanding his positive allegations that both bones in his lower right leg were broken and crushed, such is absolutely untrue. Neither bone, if the leg did receive a lick from the hammer, a fact the testimony does not conclusively establish, was broken. The muscles, tissues and ligaments were not torn.
Plaintiff made no report of the alleged injury nor did he make outcry at the time it was supposed to have happened. The foreman, Charlie and Fred Mitchell, all within a few feet of plaintiff while tamping and spacing the ties, testified that no accident occurred. Lewis Lard testified that the hammer glanced and hit plaintiff's leg. He says he saw the leg after the lick and when asked about its condition replied: "Something about as big as a quarter — something like that".
Charlie Mitchell, in part, testified as follows:
"Q. Did he get hit? A. I didn't see him get hit.
"Q. What happened? A. He was knocking a tie, spacing a tie, and he hit the top edge — the tie was 8 or 9 inches — with a mall — a glancing lick and it splintered off.
"Q. What happened? A. He said it hit his leg.
"Q. He said it hit his leg? A. Yes, sir.
"Q. Did he show you his leg? A. Yes, sir.
"Q. Did you see blood on his leg? A. A little scratch.
"Q. Was it bleeding? A. It was just skint."
Fred Mitchell's testimony on the subject is as follows:
"Q. Did you ever work with Cal James? A. Yes, sir.
"Q. Were you working with him on or about the 14th day of June, 1939? A. Yes, sir, I reckon.
"Q. Did you see him get hurt? A. No, sir.
"Q. Did you see his leg? A. He showed me his leg.
"Q. When? A. I don't know what day, whether it was the 14th or when.
"Q. What did it look like on his leg? A. There was a little scratch on it — it was sore.
"Q. Do you know whether that was the day he was supposed to have gotten hit or not? A. No, sir."
Plaintiff worked continuously from June 14th to June 27th. On this latter date he informed his foreman that he was suffering from a severe headache and desired to see defendant's local physician. He also at that time stated that he might not be able to report for work the following day. The foreman sent him to Dr. McDonald, the local physician. Dr. McDonald found a sore on the lower right leg and that the leg was highly inflamed with granulated tissues of the red cells. The leg was cleansed with a solution of antiseptic and the patient sent to the defendant's surgeon, Dr. Wharton, in El Dorado, Arkansas, for further treatment. He was there found to be suffering from several afflictions, including infected throat, enlarged glands of the throat and neck, pus in kidneys and albumen in urine. The sore on his leg had a suspicious appearance. Appropriate tests revealed chronic syphilis. He was treated for these ailments and at his request was permitted to return home on or about July 11th. Dr. Wharton advised Dr. McDonald as to the diagnoses. Dr. Wharton testified that plaintiff's trouble is due to "definite syphilitic infection of his system which *Page 516 
he has had for some time." He also testified:
"A. He had inflamation of the covering of the bone; the tissues break down and it eats into the periosteal cover and sloughs out, which is not infrequent in deep seated ulcers. That is my opinion.
"Q. In your opinion, or any time while he was under your care, did he receive a blow on that leg that would cause this condition? A. We were unable to determine that from our findings.
"Q. Did you determine that he did or did not? A. No, we didn't find any fracture in the bone or joint, but inflammation.
"Q. If he had had both bones in the leg fractured, could you have told it? A. Yes, if there was a fracture of either one, he would have been too lame to get about on his leg.
"Q. Was that condition of his leg caused by Syphilis? A. That is what we made out in our report and what I am testifying to today."
Dr. McDonald, in the capacity of private physician, treated plaintiff after his return from El Dorado and finally sent him to the Charity Hospital in Shreveport for attention as hospitalization obligations of the defendant did not include venereal diseases.
Dr. W.M. McBride made an X-ray picture of the locus of the ulcer on plaintiff's leg six or eight months after the alleged injury. The leg at that time had healed. This picture revealed no evidence of fracture or injury to the bone. It was Dr. McBride's opinion that if plaintiff was afflicted with syphilis and was injured by a blow on the leg as by him contended, the ulcer could have been caused by the blow and the syphilitic condition. However, he was certain that if the leg had been struck in the manner alleged, plaintiff could not have continued to perform heavy manual labor as he did for some two weeks. He further testified:
"Q. If a Wasserman test was made and it showed a positive result, would you say that it was a syphilitic ulcer? A. If he had a four plus Wasserman, with all the characteristics, I would say it was a syphilitic ulcer."
We are convinced from a careful consideration of all the testimony that plaintiff has had syphilis for many years and that its condition was malignant at the time he claims to have been injured. We are also convinced that on this date he had a sore or ulcer on his right shin, evidently of syphilitic origin. It is possible this sore was slightly bruised by the glancing hammer or by the disengaged piece of the tie, but if so, the injury was of no consequence and did not contribute to the condition found two weeks later. Had the blow been of sufficient force to fracture either or both bones, it is certain plaintiff would not have been able to continue work as he did. Such a blow would have provoked an outcry from him and this would have attracted the attention of the foreman and the other workmen near by. Not one of them would say that such an accident happened.
Plaintiff has failed to make out his case and for this reason the lower court rejected his demand. We are in full accord therewith. It is unnecessary to pass on the issue of negligence.
The judgment appealed from is correct and it is hereby affirmed with costs.
DREW and HAMITER, JJ., concur.